# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHERYL RHOTEN,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-571
Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 10), the Commissioner's response in

opposition (Doc. 11), and plaintiff's reply memorandum. (Doc. 12).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in July 2007, alleging disability since June 19,

2007, due to compartment syndrome surgery and an open leg wound. (Tr. 199). Plaintiff's

applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a de novo hearing before administrative law judge (ALJ) Deborah Smith.

Plaintiff and a vocational expert (VE) appeared and testified at the initial ALJ hearing held on

November 18, 2009. A second ALJ hearing was held on May 6, 2010, at which the VE and a

medical expert testified. On May 21, 2010, the ALJ issued a decision denying plaintiff's DIB

and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making

the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

### 1. Lower extremity impairments

On June 14, 2007, plaintiff saw her family physician, Dr. Gaurang Shah, D.O., of Regional Family Health Care, for pain and numbness in her right lower extremity and low back pain radiating down her leg. (Tr. 440-41). Dr. Shah referred plaintiff for a lumbar spine x-ray, which showed a normal lumbar spine with spina bifida occulata at S1[1]. (Tr. 368-69).

On June 18, 2007, plaintiff returned to Dr. Shah with persistent lower back and right leg pain. Dr. Shah reported swelling of her right calf, significant tenderness over the right foot and calf, breaks in the skin over the right leg, and a right foot drop (an inability to dorsiflex the foot). Dr. Shah sent plaintiff to the emergency room for further work up by an orthopedist and to obtain an MRI in order to rule out compartment syndrome[2]. (Tr. 438-39).

Plaintiff was admitted to the hospital, where she was diagnosed with acute compartment syndrome of the right leg, etiology unknown. (Tr. 270, 276-77). Plaintiff underwent a surgical release of the anterior, lateral and posterior compartments of her right leg. (Tr. 274-282). A second surgery was performed on plaintiff's leg on June 22, 2007, in an attempt to close the surgical wound, but the swelling was still too great. (Tr. 272-73). Plaintiff was discharged on June 27, 2007, in improved condition. (Tr. 267-268). The foot drop was better and she was able to ambulate with the use of a walker, but her leg wound remained open due to swelling and she

---

[1]"Spina bifida occulta" is a form of spina bifida in which the defect is not visible. The condition is rarely linked with complications or symptoms. http://www.emedicinehealth.com/spina_bifida/article_em.htm.

[2]"Compartment syndrome" is a serious condition that increases pressure in a muscle compartment. Compartment syndrome can lead to muscle and nerve damage and problems with blood flow. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002204/.

2

was to be followed in the hospital's Wound Care Center. (Tr. 266-68). Her discharge diagnosis was progressive right leg compartment syndrome, probably secondary to hypothyroidism. (Tr. 267).

Plaintiff followed up with the surgeon, Dr. Jesus Hontanosas, M.D., at the Wound Care Clinic on an outpatient basis. (Tr. 308-12). On July 13, 2007, Dr. Hontanosas performed a surgical debridement of necrotic muscle tissue in plaintiff's right leg. (Tr. 310-11). Dr. Hontanosas noted that plaintiff's foot drop had improved, she had good strength in most of the muscles of her right leg, and she was walking without the walker. (Tr. 310). On July 17, 2007, Dr. Hontanosas wrote: "I have been seeing [plaintiff] for a severe open wound with extensive muscle necrosis for which she is being followed in [the] Wound Care Center. I am anticipating [a] prolonged healing process and physical therapy. She will be disabled for approximately 12 months." (Tr. 312).

On August 14, 2007, Dr. Hontanosas diagnosed plaintiff with a slowly healing wound on the right leg status post release of anterior compartment syndrome. (Tr. 318-19). Dr. Hontanosas noted: "There was so much pressure on the muscle that was extremely swollen." (Tr. 318). He reported that multiple procedures had been performed at the Wound Care Center, including a "wound vac." (*Id.*). He observed that the wound appeared to be contracting. (*Id.*). Dr. Hontanosas performed another surgical debridement/curetage of the wound, release of skin edges, and application of a skin graft. (*Id.*).

Dr. William Bolz, M.D., reviewed plaintiff's medical records on behalf of the state agency in September 2007. (Tr. 345-46). He opined that plaintiff's compartment syndrome should be resolved far sooner than Dr. Hontanosas opined and would not last twelve months.

3

(Tr. 346). He noted that the open wound was still present but was slowly getting smaller, and plaintiff was able to ambulate around the house without assistance and for longer distances using an ambulatory aide. (Tr. 345).

In November 2007, Dr. Shah reported that plaintiff was gradually improving from the compartment syndrome surgery but still required a walker for weight-bearing. (Tr. 431).

Plaintiff presented to Dr. Shah on January 16, 2008, with complaints of pain and numbness in the left calf and pain in the calf when walking and climbing stairs. (Tr. 426). Plaintiff reported that her symptoms had started around the same time as her hospitalization for the right compartment syndrome in June 2007, six months earlier, but had worsened over the preceding four weeks. (*Id.*). Plaintiff informed Dr. Shah that Dr. Hontanosas had told her she had compartment syndrome in her left calf and would need surgery on that side as well, but he did not want to perform the surgery because it was not his specialty. (Tr. 426). Plaintiff was referred to an orthopedist and for an MRI of her left calf. (Tr. 426-27).

An MRI of plaintiff's left lower extremity conducted on January 30, 2008, showed no evidence of an anterior compartment syndrome. (Tr. 493). On January 31, 2008, Dr. Suresh Nayak, M.D., at Wellington Orthopaedic and Sports Medicine, evaluated plaintiff's left leg symptoms. (Tr. 417-18). He noted that both lower extremities were supple with no signs of acute compartment syndrome. (Tr. 417). On February 1, 2008, Dr. John C. Linz, M.D., at Wellington evaluated plaintiff at the request of Drs. Nayak and Shah. (Tr. 416). He noted that her left lower extremity was "somewhat tense" but she had no evidence of obvious emergent compartment syndrome, she had no pain with passive motion, and she was getting some numbness and tingling. (*Id.*). Dr. Linz diagnosed plaintiff with exertional compartment syndrome of unknown etiology and scheduled her for compartment release. (Tr. 416). Plaintiff

4

underwent compartment release surgery in the left lower extremity on February 4, 2008. (Tr. 404-10). On February 20, 2008, plaintiff reported to Dr. Linz that she was doing well post-surgery and she had no significant complaints. (Tr. 415). Plaintiff was not using crutches and had good range of motion on physical examination. Dr. Linz reported she could weight bear as tolerated; if she looked good when he saw her in two weeks, he would release her from wearing a boot; and if she was still struggling "a little bit," he would send her to physical therapy. (Tr. 415).

Plaintiff presented to the Brown County General Hospital emergency room in April 2008 complaining that her left foot had been swelling for the last few weeks. (Tr. 597-602). She stated that it hurt somewhat. (Tr. 597). Plaintiff reported that she had seen her regular doctor the previous week, but the doctor did not know the cause of the swelling. (*Id.*). Plaintiff reported that she had been diagnosed with some type of connective tissue disorder that had not yet been confirmed. (Tr. 598). Plaintiff's physical exam was unremarkable except for edema on the dorsum of the left foot. (*Id.*). Plaintiff was given medication and scheduled for a vascular ultrasound (Tr. 599), which disclosed no evidence of DVT (deep venous thrombosis) or SVT (supraventricular tachycardia) of the left leg or right common femoral vein. (Tr. 491).

A bone scan of plaintiff's lower extremities performed on June 13, 2008, showed: "Some very mild increased uptake right mid-tibia. No intense, abnormal uptake left lower leg." (Tr. 490).

Plaintiff consulted with various specialists at the Cleveland Clinic in the summer of 2008. (Tr. 507-54). Plaintiff saw orthopedist Dr. George Balis, M.D., on June 30, 2008, for orthopedic evaluation of her painful left foot. (Tr. 526-34). Plaintiff reported that she had developed increasing pain in the right leg with numbness and tingling in the right foot beginning a year

5

earlier; she had eventually regained function of her foot following surgery for compartment syndrome of the right leg; she had developed similar symptoms on the left and eventually underwent surgery for compartment syndrome in the left leg; a few months later she developed vision disturbance in the left eye and pain and weakness in the left hand, but an MRI and MRA (magnetic resonance angiogram) of the brain were reportedly negative; she was found to have hypothyroidism; a rash broke out on her leg and hands at times; she had been tested for Lymes disease but the results were inconclusive; she smoked more than one-half pack of cigarettes a day; and she had been diagnosed as bipolar. (Tr. 527). On physical examination, plaintiff walked with a normal gait with shoes on. (Tr. 528). She had a mildly antalgic gait while barefoot. She had some mild swelling in the left midfoot and forefoot and some very slight erythema; some mild tenderness over the dorsum of the entire forefoot; and good motion in the toes but some pain over the dorsum of the MP joints, first through fifth with maximum plantar flexion. Her foot was not hot and she could walk on her toes and heels well bilaterally. Dr. Balis read left ankle and foot x-rays taken that day (Tr. 545) as normal. Dr. Balis noted that without having all of plaintiff's records, he did "not have an answer that could tie in all of her symptoms." (Tr. 528). He recommended plaintiff see a rheumatologist because she may have vasculitis or an inflammatory arthropathy, and he also recommended that she see someone in vascular medicine. (*Id.*). Dr. Balis stated that based on the history plaintiff gave, the swelling in her foot and her pain seemed to wax and wane. He noted the bone scan report showed some increased uptake in the right leg but no evidence of increased uptake in her left foot. Dr. Balis discussed with plaintiff the need for emergency follow-up if her symptoms increased. (*Id.*).

Two rheumatologists, Drs. Anupama V. Shahane, M.D., and Matthew P. Bunyard, M.D., examined plaintiff on July 22, 2008, and reported "low suspicion" for a systemic rheumatologic

disease. (Tr. 511-16). They noted plaintiff's history of compartment syndrome in her right and left legs; intermittent rash on her hands which was resolved by steroid cream; hypothyroidism diagnosed in 2008; an episode of left eye visual changes and left hand weakness; negative MRI and MRA, normal EMG, negative test results for Lymes disease, and blood work performed by a rheumatologist. (Tr. 511). The rheumatologists noted the following on the review of plaintiff's system:

- loss of vision in left eye for about 20 minutes about five months earlier, resolved spontaneously, associated with left hand weakness which lasted about two months
- skin rash, per history of present illness
- ankle pain with swelling
- headache per history of present illness
- history of bipolar disorder, for which she was on medications

(Tr. 511-512). On physical examination, she had trace ankle and feet edema bilaterally. (Tr. 513). On neurological examination, her reflexes were diminished in both lower extremities but she had normal gait, normal sensation, and normal muscle strength. (Tr. 513). There were no abnormal findings of the musculoskeletal system. (Tr. 513). The attending rheumatologist, Dr. Bunyard, diagnosed plaintiff with myopathy[3] NOS and recommended that plaintiff undergo further testing and that a neuromuscular consult be considered. (Tr. 516).

Drs. Malek Al Hawwas, M.D., and Firas Al Solaiman, M.D., both vascular specialists, evaluated plaintiff that same day. (Tr. 520-24). They opined that in light of plaintiff's physical examination, age and risk factors, it was unlikely she had a vascular etiology of her symptoms, and they noted the review of her systems was "roughly unremarkable." (Tr. 524). Dr. Solaiman agreed with the plan to obtain a blood test and pursue an evaluation with neuromuscular neurology. (Tr. 524).

---

[3]"Myopathy" is a muscle disease unrelated to any disorder of innervation or neuromuscular junction. http://emedicine.medscape.com/article/759487-overview.

An arterial duplex study of plaintiff's legs that was subsequently performed at the

Cleveland Clinic on July 28, 2008, was normal. (Tr. 508, 552-53). Dr. Solaiman, who was

present during the testing, reported that the ABI (ankle-brachial indices - a measurement of

arterial insufficiency) were normal at rest and with exercise, although plaintiff was in "severe

pain" after walking on the treadmill for five minutes. (Tr. 508). Dr. Solaiman found no evidence

of peripheral arterial disease. (*Id.*). Dr. Solaiman concluded:

> In conclusion, I do not know what is the etiology of her leg pain or compartment
> syndrome. (Tr. 508). Her leg pain is triggered by standing and by walking
> relatively short distances. right > left. She did have elevated CK [creatine kinase]
> in the past which suggest[s] muscle injury. I do not think this [is] related to
> vascular causes. I agree with Dr. Bunyard regarding evaluation for neuromuscular
> disorders.
> Her leg swelling presented mainly after the surgeries, could be related to venous
> insufficiency. No swelling today on exam (swelling worse by the end of the day).
> I will fit her for 20-30 mmHg knee high compression stocking. I discussed my
> recommendation with Rheumatology staff.

(Tr. 508).

An EMG of plaintiff's left upper and lower extremities taken on July 28, 2008, revealed a

"mildly low left sural sensory response, which could come from her surgical scars, body habitus

or from edema. There [was] no evidence of a generalized myopathy." (Tr. 547).

In August 2008, Dr. Shah diagnosed plaintiff with chronic bilateral lower extremity pain

for which he prescribed neurontin; depression and mood disorder for which plaintiff was taking

Cymbalta, Lamictal, Seroquel and Klonopin; tobacco abuse for which she was using nicorette

gum; and hypothyrodism for which she was taking Synthroid. Dr. Shah noted that plaintiff was

also on Prednisone, which had been prescribed by another physician. Dr. Shah wrote a six-

month prescription for a handicapped placard based on plaintiff's "reported inability to walk long

distances." (Tr. 486-87).

8

Upon examination by Dr. Shah in June 2009, plaintiff complained of chronic bilateral lower extremity pain. Dr. Shah found mild inflammation and trace pitting edema in plaintiff's left foot and mild decreased sensation in the right distal tibia. Dr. Shah wrote a new six-month prescription for a handicap placard at plaintiff's request. (Tr. 484-85).

MRIs of plaintiff's lower legs were performed on June 22, 2009. The MRI of the lower right leg showed post-surgical scarring in the subcutaneous tissues, normal signal of the muscles of the right lower leg, and no abnormal fluid collections within the fascial compartments of the leg. (Tr. 488). The MRI of the lower left leg revealed (1) post-operative changes in the subcutaneous tissue, and (2) minimal nonspecific edema in the medial head of the gastrocnemius that could be due to vascular phenomenon, acute denervation, or non-specific myositis.[4] (Tr. 488-89).

Plaintiff presented to the Brown County General Hospital emergency room in February 2010 with left leg pain that had persisted for four days. She had edema in the left foot. (Tr. 574). Plaintiff underwent a doppler study to rule out deep venous thrombosis. She was given prescriptions for Vicodin and Flexeril (Tr. 576) and discharged. (Tr. 569-77).

## 2. Upper extremity impairments/hand impairment

In addition to problems with her lower legs, plaintiff complained to Dr. Shah in September 2007 about problems with the fingers on her left hand. (Tr. 432-35). After finding that plaintiff could not fully extend her left third and fourth fingers, Dr. Shah referred plaintiff to an orthopedic specialist, Dr. George T. Shybut, M.D., at Wellington Orthopedics. (Tr. 433-35).

---

[4] "Myositis" is inflammation of the skeletal muscles, which are the muscles an individual consciously controls to help move their body. http://www.nlm.nih.gov/medlineplus/myositis.html

Upon examination, Dr. Shybut found that plaintiff could not extend the two middle fingers more than 15 degrees. He made no other positive findings. (Tr. 420).

In October 2007, plaintiff complained to Dr. Shah of weakness throughout a greater portion of her left hand, problems with dropping things, and difficulty pushing a turn signal with her left hand. She also reported intermittent changes in her vision and balance problems over the prior month. (Tr. 430-31). A left arm EMG performed in October 2007 on Dr. Shybut's recommendation was normal. (Tr. 419).

Plaintiff saw neurologist Ashraf Nassef, M.D., on referral from Dr. Shah on October 24, 2007, for complaints of weakness and pain in her left hand. Dr. Nassef found mild weakness in her left hand, noted negative diagnostic test results, and recommended that plaintiff work on strengthening her hand and follow up with him in two or three months. (Tr. 402-03).

In November 2007, Dr. Shah saw plaintiff for follow-up of her left hand weakness and numbness. (Tr. 428). Plaintiff reported that she also now had some partial intermittent numbness over the entire dorsal aspect of her right hand. (*Id.*). Dr. Shah found that plaintiff had tenderness to palpation over the mid-ulnar aspect of the left flexor forearm with taut musculature and an isolated patch of decreased sensation over the dorsum base of her first and second fingers. (*Id.*).

When seen in December 2007 for follow-up evaluation of the weakness in her left hand, Dr. Nassef found that plaintiff had mild weakness in the dorsal interossei in the left hand but no other positive findings. Dr. Nassef recommended that plaintiff follow up with him in two months. (Tr. 401).

### 3. Opinion evidence

Plaintiff saw rheumatologist Dr. Robert Hiltz, M.D., three times between November 2007 and April 2008. Dr. Hiltz did not suspect a rheumatologic condition. (Tr. 443-44). He noted that concerns about a possible underlying connective tissue disease had been strongly suggested by other physicians, but no other identifiable or unifying cause had been provided. He indicated that he could not opine on plaintiff's functional status from his examination and the studies he had obtained thus far, noting "normal lab studies and absence of inflammatory synovitis but history of serious chronic problems including the bipolar disorder." (Tr. 444).

On November 10, 2009, certified nurse practitioner (CNP) Kimberlee Miller from Regional Family Health Care completed a Physical Residual Functional Capacity (RFC) form. (Tr. 502-06). Ms. Miller stated that plaintiff had previously been seen by another provider and that she had first seen plaintiff the previous day. (Tr. 502). Ms. Miller listed plaintiff's diagnoses as right lower leg compartment syndrome, hypothyroidism, and bipolar disorder, and she reported that plaintiff's prognosis was stable. Ms. Miller listed plaintiff's symptoms as weakness in the lower legs, poor exercise tolerance, difficulty focusing on tasks, and numbness, tingling and pain in the lower extremities, usually with exertion. Ms. Miller noted the following for clinical findings and objective signs: "Physical exam essentially unremarkable except [decreased] grip strength bilateral hands." (Tr. 502). Ms. Miller opined that plaintiff's impairments had lasted or could be expected to last at least 12 months.

Ms. Miller further opined that plaintiff's pain and symptoms would frequently interfere with her attention and concentration and she was capable of low stress jobs. Ms. Miller stated as the basis for her conclusion that plaintiff was alert and calm during the physical examination.

11

Ms. Miller estimated that plaintiff can walk less than one block without rest or severe pain; she can sit for 15 minutes at one time and for a total of four hours out of eight; she can stand for ten minutes at a time and stand/walk for less than two hours out of eight; she needs a job with a sit/stand at will option; she will need to take 15 to 20-minute unscheduled breaks at least once an hour; and she does not need to elevate her legs with prolonged sitting. (Tr. 504). Ms. Miller further opined that plaintiff can occasionally lift up to 10 pounds and rarely lift 20 or 50 pounds; she can occasionally look down or up, turn her head to the right or left, and hold her head in a static position; she can occasionally twist or bend; and she can rarely crouch/squat and climb ladders or stairs. (Tr. 505). Ms. Miller also opined that plaintiff had no significant limitations in her reaching, handling or fingering but that she can grasp, turn and twist objects with her right and left hands only 20% of the workday; use her fingers for fine manipulation only 10% of the workday; and reach with her arms, including overhead, only 10% of the workday. (Tr. 506). Finally, Ms. Miller opined that plaintiff was likely to be absent from work about three days per month as a result of her impairments. (*Id.*).

### B. Mental Impairments

On August 27, 2006, plaintiff was admitted overnight to Mercy Clermont Hospital after presenting to the emergency department for psychiatric care. (Tr. 336-44). She reported long-standing mental health issues for which she was currently being treated by her primary care physician. (Tr. 337). Her medications included Xanax and Klonopin for anxiety and Zyprexa. (Tr. 337). The attending psychiatrist, Dr. Rodney E. Vivian, M.D., diagnosed plaintiff upon discharge with mood disorder, NOS; rule out bipolar affective disorder and polysubstance dependence; and post traumatic stress disorder. Plaintiff was assigned a Global Assessment of

Functioning (GAF) score of 60.[5] (*Id.*). Recommendations were made for plaintiff to take Lamictal in increasing doses, to take Trazadone at nighttime for sleep, and to taper off Klonopin, and plaintiff contracted to abstain from alcohol and marijuana. (*Id.*).

Plaintiff was seen by a counselor, Marthe Thomas-Turner, RN, MSN, APRN, at Talbert House/Centerpoint Health on September 5, 2006. (Tr. 473). Her mood was described as anxious, apprehensive, and depressed. Ms. Turner opined based on plaintiff's complaints and history of antidepressant failure that she appeared to have a mood disorder, and likely bipolar disorder. (Tr. 473). Ms. Turner noted there were many stressors in plaintiff's life and she was struggling in her functioning. (Tr. 473). Ms. Turner noted that a treatment plan would be determined at the next visit, but plaintiff failed to show for her follow-up appointment. (Tr. 472).

In July 2007, plaintiff asked Dr. Shah to follow her for her bipolar disorder, which was stable on current medications, and to prescribe her psychotropic medications because her insurance had changed and she could no longer afford to treat with Dr. Vivian. (Tr. 436). Dr. Shah prescribed Lamictal, Cymbalta and Trazadone. (Tr. 437). In September 2007, plaintiff complained of a great deal of stress and anxiety related primarily to behavioral issues of her daughter, who had a history of post-traumatic stress disorder and was seeing a therapist at Talbert House. (*Id.*). Plaintiff felt her symptoms had worsened over the last several months, and Dr.

---

[5]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." (*Id.*). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. (*Id.*).

Shah noted that she was very receptive to seeking psychiatric care. (*Id.*). Later that same month, plaintiff signed her drug contract and reviewed it with Dr. Shah, who noted that if her tests came back positive for any illicit substances, including marijuana, he would stop prescribing Klonopin. (Tr. 433). Dr. Shah also referred plaintiff to Talbert House psychiatry. (Tr. 433).

That same month, Dr. Vivian, the psychiatrist who had seen plaintiff while hospitalized the prior year, completed a questionnaire indicating that he had seen plaintiff only two times: September 1, 1998, and April 24, 2007. (Tr. 349). Dr. Vivian reported that plaintiff was "non-compliant." (Tr. 350).

Dr. Shah noted on October 16, 2007, that plaintiff was no longer being followed by Dr. Vivian because he had stopped taking plaintiff's insurance and it was too costly for her to see him, and her bipolar disorder was stable on her current medications. (Tr. 431). Dr Shah gave plaintiff new prescriptions for Lamictal, Cymbalta and Trazadone. (*Id.*). On November 20, 2007, Dr. Shah noted that plaintiff was not currently seeing anyone for her bipolar disorder as she had filled out the paperwork at Talbert House but had never received a call back. (Tr. 428). Plaintiff remained on her medications prescribed by Dr. Shah. (*Id.*). On February 28, 2008, Dr. Shah noted that the Talbert House situation needed to be clarified. (Tr. 425).

Consultative examining psychologist Dale Seifert, M.S. Ed., examined plaintiff and prepared a report dated October 27, 2007. (Tr. 377-81). Mr. Seifert noted that plaintiff drove to the appointment. Plaintiff reported losing jobs in the past because she was unreliable due to mood swings, with her longest job lasting approximately one year. (Tr. 378). She also reported attempting suicide several years earlier. Mr. Seifert noted that plaintiff was able to express herself relatively well, her affect was flat, her eye contact was poor in both amount and quality,

and she appeared to have a poor self-concept. (Tr. 379). Plaintiff reported frequent crying spells, frequent anxiety, irregular appetite, feelings of hopelessness, mood swings, and variable sleep. (*Id.*). She reported that her previous counseling was helpful and her medicine was helping.

Mr. Seifert administered the WRAT-3 and a mental status examination and found that plaintiff had no problems with reading or simple mathematics, but she had a significant deficit in short-term auditory recall. (*Id.*). Mr. Seifert diagnosed plaintiff with Bipolar I Disorder, most recent episode mixed, and assigned a GAF of 65.[6] (Tr. 380). He opined that plaintiff would have mild limitations in her ability to understand and follow instructions and to maintain attention to perform simple, repetitive tasks, and she would have moderate limitations in her ability to relate to others, including coworkers and supervisors, and in her ability to tolerate the pressures of day-to-day work activity due to her mood swings. (Tr. 381).

State agency reviewing psychologist Dr. Leslie Rudy, Ph.D., reviewed plaintiff's medical records and prepared a Mental RFC Assessment in November 2007. (Tr. 382-99). Dr. Rudy opined that plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (Tr. 382-83). Dr. Rudy reported that according to Dr. Vivian's

---

[6] The DSM-IV categorizes individuals with GAF scores of 61 to 70 as having "some mild" symptoms and as "generally functioning pretty well." *See* DSM-IV at 32.

office notes, plaintiff treated with Dr. Vivan for approximately nine years and she was noted to be noncompliant. (Tr. 384). Dr. Rudy also completed a Psychiatric Review Technique in which she opined that plaintiff had mild limitations in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 396). Dr. Rudy gave weight to Mr. Seifert, determined that plaintiff's statements were partially credible, and concluded that plaintiff could perform simple to moderately complex tasks, interact on a superficial level, and work in an environment without frequent changes or the need to perform rapidly. (Tr. 384).

Plaintiff presented to the Brown County General Hospital emergency room on March 10, 2008, seeking a mental health consult due to stress. (Tr. 603-08). She was diagnosed as bipolar by history with emotional stress and attention seeking behavior. She was discharged and arrangements were made for a mental health follow-up appointment. (Tr. 604).

Plaintiff failed to show for an appointment at Talbert House in January 2008 but subsequently saw a counselor at that location, Mary Winchel, MSW, LSW, on April 10, 2008. The counselor noted that plaintiff was presently being treated by her family doctor with a poor outcome. Plaintiff's affect on that visit was "full range," her mood was anxious, and her behavior was guarded. (Tr. 469-71).

Plaintiff underwent a diagnostic assessment at Talbert House in May 2008. (Tr. 474-82). The diagnostic assessment form appears to contain information provided at different times, including updated information provided on May 5, 2008. (Tr. 474). The May 5, 2008 update notes that plaintiff had stopped seeing the therapist, Ms. Winchel, when her insurance changed

16

and she "just did not think about seeing another therapist" when she had insurance again. (*Id.*) The report noted that plaintiff's family doctor had prescribed Lamictal, Cymbalta, and Trazadone since January or February of 2007. (*Id.*) Plaintiff reported mood swings, impulsiveness and sleep disturbance, and she reported experiencing many stressors since May or June of 2007. (*Id.*). Plaintiff admitted to marijuana and alcohol use during the past 12 months, but reported she had abstained over the past seven to eight months. (*Id.*). On mental status exam, plaintiff's expression was sad; she was restless, tense, constricted, anxious, and depressed, and her impulse control was fair. (Tr. 481). The counselor diagnosed plaintiff with bipolar disorder, most recent episode mixed, severe without psychotic features. (Tr. 482). The counselor recommended a psychiatric examination and therapy. (Tr. 482).

The record includes treatment notes from psychiatrist Dr. Dipitika Shah, M.D., and Ms. Winchel at Talbert House for the period April 10, 2008 to September 9, 2009 (Tr. 447-69) and from Dr. Dipitika Shah for the period November 2, 2009 to February 24, 2010. (Tr. 556-67). Medications prescribed by Dr. Shah included Lamicta, Cymbalta, Klonopin, Seroquel, Adderal, and Trazadone. (Tr. 566-67).

### C. Medical expert testimony

Dr. Hershel Goren, M.D., a neurologist, testified as a medical expert at the ALJ hearing. (Tr. 76-95). After summarizing plaintiff's medical history, Dr. Goren testified that plaintiff's compartment syndrome was a complication of hypothyroidism, which was now under control; plaintiff's surgery on June 22, 2007, cured her right compartment syndrome; and although she underwent compartment syndrome surgery for the left leg on February 4, 2008, she apparently recovered completely from her compartment syndrome because an EMG conducted on July 22,

2008, was normal. (Tr. 78-79, 82). Dr. Goren testified that any swelling noted by the doctors in the record is a residual of her previous compartment syndrome, it is mild, and it is not impairing. (Tr. 85). Dr. Goren also pointed out that no physician had identified a cause for plaintiff's symptoms. (Tr. 84). He testified that the record did not support the conclusion that plaintiff had recurrent episodes of compartment syndrome in her arms and legs. (Tr. 90-94). Dr. Goren testified that in his opinion, plaintiff is "100 percent" recovered from her compartment syndrome and arguably has no restrictions. (Tr. 85). However, in an "abundance of caution" and to allow for the possibility of an oversight, Dr. Goren limited plaintiff to lifting 20 pounds occasionally and ten pounds frequently and to no climbing, balancing or working at unprotected heights. (Tr. 80-81, 85).

Dr. Goren also offered an opinion on the physical RFC questionnaire completed by Ms. Miller, the certified nurse practitioner. Dr. Goren questioned Ms. Miller's assessment because (1) although Ms. Miller opined that plaintiff had restrictions on cervical range of motion and upper limb function, there was no indication in the record that plaintiff's compartment syndrome affected her arms, and (2) Dr. Goren did not see where Ms. Miller had examined plaintiff, and the most recent examination by an individual in Ms. Miller's practice had been performed by Dr. Guarang Shah on April 8, 2008. (Tr. 79, citing Tr. 422-23).

Dr. Goren also testified about limitations caused by plaintiff's psychological impairments, which he identified as bipolar disorder, PTSD, and substance abuse. (Tr. 80). He opined that in order to accommodate plaintiff's psychological impairments, she should not be required to meet high production quotas and she should be limited to superficial interpersonal interaction with supervisors, coworkers, and the general public. (Tr. 81).

18

### III. Analysis

#### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant [met] the insured status requirements of the Social Security Act
> through March 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since June 19,
> 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: history of compartment
> syndrome (resolved with treatment); depression; and history of polysubstance
> abuse (reportedly in remission) (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments
> that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart
> P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),
> 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except that she should never climb
> ladders/ropes/scaffolds or ramps/stairs. She should never work around
> unprotected heights. She should never balance or climb. The work should not
> require high production quotas. She should not engage in piecework. She should
> have no more than superficial contact with others. She should never involve
> herself in work requiring arbitration/negotiation/confrontation/and being
> responsible for the safety and welfare of others.
>
> 6. The claimant is capable of performing her past relevant work as a cashier
> (DOT: 211.462-010). This work does not require the performance of work-related
> activities precluded by the claimant's residual functional capacity (20 CFR
> 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 19, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 11-18).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

21

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ improperly relied on the testimony of the medical expert, Dr. Goren; (2) the ALJ erred in finding plaintiff's hand pain to be a "non-severe" impairment; (3) the ALJ erred by failing to accord sufficient weight to the opinion of Ms. Miller, a certified nurse practitioner; and (4) the ALJ erred by improperly assessing plaintiff's credibility.

### 1. The ALJ did not err by relying on the testimony of the medical expert.

Plaintiff argues that the ALJ erred by relying on the testimony of the medical expert, Dr. Goren, for essentially four reasons: (1) Dr. Goren's testimony that plaintiff's compartment syndrome had resolved following surgery is inconsistent with the record, the current medical definition of compartment syndrome, and current treatment protocols; (2) it was not reasonable for the ALJ to rely on the opinion of a neurologist such as Dr. Goren concerning plaintiff's compartment syndrome because the condition is a vascular or orthopedic issue (Doc. 10 at 14, citing p. 2 n. 1 and Appendix A); (3) Dr. Goren's testimony about plaintiff's left hand impairment is unreliable because he found without record support that Dr. Guarang Shah is an inexperienced physician whose objective findings regarding plaintiff's left hand were not valid; and (4) Dr. Goren is simply a reviewing physician whose opinion is entitled to no greater weight than that of a state agency reviewing physician.

In response, the Commissioner contends that the ALJ had before her two opinions on plaintiff's functional limitations: one from the medical expert, Dr. Goren, and one from the examining "non-medical source," certified nurse practitioner Miller, and that the ALJ's decision to credit Dr. Goren's opinion over that of Ms. Miller is supported by substantial evidence. The

Commissioner argues that the evidence plaintiff has attached to her Statement of Errors cannot properly be considered by this Court because it was not part of the administrative record, and in any event, it fails to show that Dr. Goren was not qualified to testify in this matter.

The purpose of a medical expert is to advise the ALJ on medical issues and answer specific questions about the claimant's impairments, the medical evidence, the application of the listings, and functional limitations based on the claimant's testimony and the record. *See* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (d) of this section."). Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). As a non-examining source, the weight to be afforded a medical expert's opinion depends on the degree to which the medical expert provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Under the Social Security regulations, evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06-03p, 2006 WL 2329939, at *2. However, evidence from "other sources" as defined under the regulations may be used to show the severity of the claimant's

impairment and how it affects the individual's ability to function. 20 C.F.R. §§ 404.1513(d), 416.913(d). A nurse practitioner is one such "other source." *Id.* It may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *5. The ALJ has the discretion to determine the appropriate weight to accord the opinion of a medical source who is not an "acceptable medical source" based on all the evidence in the record. *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).

Here, although the record includes many treatment notes documenting plaintiff's physical and mental impairments, there are only two opinions of record concerning plaintiff's functional limitations resulting from her physical impairments: (1) the opinion rendered by the medical expert, Dr. Goren, and (2) the opinion of the certified nurse practitioner, Ms. Miller. The ALJ decided to accept Dr. Goren's opinion on the grounds that he is a neurologist, he had the benefit of reviewing the entire longitudinal record, and his testimony was consistent with the record as a whole. (Tr. 17). The ALJ decided to give Ms. Miller's assessment "little weight" because she is not a doctor or neurologist but is instead a certified nurse practitioner; she stated that the physical examination was essentially normal; and she saw the claimant only one time. The ALJ also determined that the record supports Dr. Goren's testimony that Ms. Miller apparently never actually examined plaintiff but based her assessment of plaintiff's RFC on plaintiff's symptoms, there was no objective basis for the limitations Ms. Miller imposed, and the examination performed closest to Ms. Miller's assessment was performed by Dr. Shah who, according to Dr. Goren's review of the record, did not perform a thorough examination for compartment

syndrome. (Tr. 16-17). These are valid reasons for the ALJ to credit the opinion of the medical expert Dr. Goren over that of the "other source," Ms. Miller, and the ALJ's decision finds substantial support in the record.

Because a certified nurse practitioner is not an "acceptable medical source," it was within the ALJ's discretion to determine what weight to accord Ms. Miller's opinions based on all the evidence in the record. *Walters*, 127 F.3d at 530. The ALJ reasonably rejected Ms. Miller's opinion that plaintiff can walk less than one block without rest or severe pain; she can sit for 15 minutes at one time and for a total of four hours out of eight; she can stand for ten minutes at a time and stand/walk for less than two hours out of eight; she needs a job with a sit/stand at will option; she will need to take 15 to 20-minute unscheduled breaks at least once an hour; she can occasionally lift up to 10 pounds and rarely lift 20 or 50 pounds; she can occasionally look down or up, turn her head to the right or left, and hold her head in a static position; she can occasionally twist or bend and rarely crouch/squat, and climb ladders or stairs; she can grasp, turn and twist objects with her right and left hands only 20% of the workday; she can use her fingers for fine manipulation only 10% of the workday; and she can reach with her arms, including overhead, only 10% of the workday. (Tr. 506). Ms. Miller completed the physical RFC questionnaire after only her first contact with plaintiff, noting that plaintiff had previously been seen by another provider. (Tr. 502). Ms. Miller does not give any indication as to what type of physical examination she performed on that first visit and whether she conducted any strength or other type of testing. Nor does Ms. Miller provide objective and clinical findings to support the nature and severity of the limitations she imposes. To the contrary, she notes that

plaintiff's physical exam was "essentially unremarkable" except for decreased grip strength in her hands bilaterally. (Tr. 502).

Conversely, Dr. Goren, a neurologist, reviewed all the evidence of record and provided supporting explanations for his opinion that plaintiff's compartment syndrome resolved following her surgeries. Plaintiff challenges Dr. Goren's competence to testify as a medical expert in her case on several grounds, asserting that he has not treated a patient in 14 years, he did not testify that he has any specialized knowledge of compartment syndrome, and compartment syndrome is not a neurological issue. (Doc. 10 at 14-15). However, Dr. Goren testified that he is certified in neurology by the American Board of Psychiatry and Neurology, he had a valid medical license at the time of the hearing, and he took continuing education courses (Tr. 76-77), and he demonstrated his knowledge of compartment syndrome at the ALJ hearing. Accordingly, the ALJ was entitled to consider Dr. Goren's opinion in accordance with the regulatory scheme. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

Plaintiff argues that Dr. Goren's opinion that her compartment syndrome resolved following her surgery and that any continuing symptoms were not the result of that impairment is entitled to minimal weight because it is inconsistent with the other medical opinions and evidence in the record, the current medical definition of compartment syndrome, and current treatment protocols. (Doc. 10 at 16). Plaintiff asserts that she suffers from "compartment syndrome in multiple limbs and that condition continued even after her 2007 surgeries." (*Id.* at 17). Plaintiff asserts she continues to experience swelling, pain, numbness and decreased sensation in her lower extremities. (Doc. 10 at 17). Plaintiff disputes Dr. Goren's opinion that she should have been referred to a surgeon or specialist for another surgery if her compartment

syndrome had not resolved, asserting the opinion is based on an incorrect understanding of the facts. She contends that she was "referred to the Cleveland Clinic in June 2008 to determine the etiology of her compartment syndrome" (Doc. 10 at 16, citing Tr. 507-554), and the fact that she had no further surgeries is not dispositive because "chronic compartment syndrome should be treated conservatively." (*Id.*, citing Appendix A).

However, plaintiff has not cited any medical evidence in the record that supports her lay theory that she continues to suffer from compartment syndrome and that shows Dr. Goren's medical opinion to the contrary is based on an incorrect understanding of the facts. Plaintiff is correct that the record shows she had continued mild swelling and edema following her surgeries (Tr. 484- trace pitting edema in left foot, 6/1/09; Tr. 486- trace edema right distal lower extremity to ankle, 8/13/08; Tr. 511, 513- trace edema and swelling in ankles, 7/22/08; Tr. 598- edema on dorsum of the left foot, 4/25/08). However, no medical source opined that these symptoms are the result of compartment syndrome. Nor did any doctor diagnose plaintiff with this condition following her left leg compartment surgery. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06-03p, 2006 WL 2329939, at *2 (evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment). Furthermore, Dr. Goren testified that based on his review of the record, his clinical experience, and his knowledge of the medical literature, the swelling plaintiff experienced was a residual of her previous compartment syndrome, it was mild, and it was not impairing. (Tr. 85, 94). As the ALJ noted, Dr. Goren specifically relied on evidence showing that plaintiff had a normal EMG in July of 2008 (Tr. 79); her hypothyroid condition, which had triggered her compartment syndrome, had stabilized (Tr. 78-79); and no treating provider had referred her to a surgeon or specialist for surgery as had

27

occurred when she previously developed compartment syndrome (Tr. 94). (Tr. 16). Accordingly, the ALJ did not err by deciding to give great weight to Dr. Goren's expert medical opinion that plaintiff's compartment syndrome fully resolved following her surgeries and that she experienced only mild, residual symptoms.

Plaintiff further argues that the ALJ erred by relying on Dr. Goren's testimony about her left hand impairment because Dr. Goren's testimony on this point is unreliable. Plaintiff contends that several examining physicians have made objective findings of weakness (Tr. 401, 403, 420) and decreased range of motion, decreased grip strength, and tenderness to palpation (Tr. 428, 430, 432-433). (Doc. 10 at 17).

With respect to plaintiff's hand impairment, the ALJ relied on Dr. Goren's testimony that normal EMG findings indicated there was no nerve problem and that plaintiff's complaints were not the result of compartment syndrome (Tr. 88); Dr. Shah's objective findings were not reliable because they were not specific enough, which in Dr. Gordon's opinion was attributable to Dr. Shah's lack of experience in performing those types of examinations (Tr. 89-90); and the record did not show an underlying objective basis for the subjective hand complaints noted by plaintiff's primary care physician. (Tr. 86-93). (Tr. 16). Substantial evidence supports the ALJ's decision to afford "great weight" to Dr. Goren's opinion concerning plaintiff's hand impairment for these reasons. The objective findings plaintiff cites occurred during a three-month period between September and December 2007, and there is no evidence from an "acceptable medical source" that establishes plaintiff suffered from a hand impairment after this time period. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06-03p, 2006 WL 2329939, at *2 (evidence from an

"acceptable medical source" is required to establish the existence of a medically determinable impairment).

Thus, the ALJ did not err by rejecting Ms. Miller's opinions and giving greater weight to the opinions of the medical expert, Dr. Goren. Plaintiff's first assignment of error should be overruled.

### 2. The ALJ did not err by finding plaintiff's hand pain is a "non-severe" impairment.

Plaintiff alleges as her second assignment of error that the ALJ erred by finding her hand pain is a non-severe impairment. (Doc. 10 at 17-18). Plaintiff asserts that the ALJ discussed her hand impairment only when summarizing Dr. Goren's testimony (Tr. 16), which is neither accurate nor consistent with the objective findings of tenderness to palpation, decreased range of motion, and decreased grip strength made by the examining physicians. (Doc. 10 at 18, citing Tr. 401, 403, 420, 428, 430, 432-33). Plaintiff contends that her complaints of hand pain, numbness, and weakness are supported by the record and have more than a minimal effect on her ability to work. (Doc. 10 at 18). The Commissioner argues in response that plaintiff has not identified a medically determinable hand impairment that the ALJ failed to recognize, and plaintiff fails to acknowledge that the ALJ further discussed her hand impairment in her decision when she noted that an EMG ordered in September 2007 was normal (Tr. 13, citing Tr. 421-441), treating providers indicated they did not know the source of the hand and forearm pain, and there was no indication from the record that the left hand problem had anything to do with compartment syndrome. (Doc. 11 at 10-11). In reply, plaintiff "points out that her left arm impairment is part of the exertional compartment syndrome" as demonstrated by Dr. Shah's finding that she had "left flexor forearm tenderness to palpation (mid-ulnar aspect) with  taut musculature" (Tr. 428)

(emphasis added by plaintiff), and Dr. Linz "explicitly diagnosed [her] with exertional compartment syndrome." (Doc. 12 at 4, citing Tr. 412).

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. *See* 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). Basic work activities relate to the abilities necessary to perform most jobs, such as the ability to perform physical functions. 20 C.F.R. §§ 404.1521(b), 416.921(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimis* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers v. Commissioner*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

Here, substantial evidence supports the ALJ's determination that plaintiff does not have a severe left hand impairment. For the reasons explained in connection with plaintiff's first assignment of error, the ALJ was entitled to rely on Dr. Goren's testimony to find that plaintiff does not have a severe hand or arm impairment. No medical source has diagnosed plaintiff with

a hand or arm impairment. Nor has a medical source opined that plaintiff's upper extremity symptoms were caused by compartment syndrome. Furthermore, plaintiff testified at the ALJ hearing that she had left arm or hand symptoms for a period of only two to three months around December of 2007 and that she was no longer experiencing any such symptoms as of the date of the hearing. (Tr. 48-49, 50). Finally, aside from the assessment of Ms. Miller, which the ALJ was entitled to reject for the reasons explained above, there is no medical or other objective evidence of record that shows plaintiff is functionally limited to any degree by a hand or arm impairment. Accordingly, the ALJ did not err by failing to find that plaintiff suffers from a severe hand impairment. Plaintiff's second assignment of error should be overruled.

### 3. The ALJ did not err by according "little weight" to the opinion of Ms. Miller.

Plaintiff alleges as her third assignment of error that the ALJ improperly accorded less weight to the opinion of the certified nurse practitioner, Ms. Miller, who plaintiff characterizes as a "treating source," than she accorded to the opinion of the medical expert, Dr. Goren. (Doc. 10 at 20). Plaintiff notes that in deciding to accord "little weight" to Ms. Miller's assessment, the ALJ relied on the fact that Ms. Miller is not a doctor whereas Dr. Goren is a neurologist; Ms. Miller had seen plaintiff only once before she completed the RFC assessment; Ms. Miller noted that her physical examination of plaintiff was "essentially normal;" and Dr. Goren opined that Ms. Miller relied on plaintiff's subjective statements when completing her assessment. (*Id.*, citing Tr. 17). Plaintiff contends that the bases for the ALJ's decision are incorrect. Plaintiff concedes that Ms. Miller examined her only one time before completing the RFC assessment, but plaintiff alleges that Ms. Miller had the opportunity to examine the treatment notes from her practice, Regional Family Healthcare; Ms. Miller was aware of other doctors' treatment notes

documenting findings of decreased grip strength; and Ms. Miller's description of plaintiff's impairments is consistent with the objective findings contained in the earlier medical records, it is consistent with other physicians' findings, and it supports her opinion of the limitations imposed by plaintiff's impairments. Specifically, plaintiff points to the article on compartment syndrome attached to her Statement of Errors (Doc. 10, Appendix A) to argue that "essentially normal" physical examination findings are not inconsistent with a diagnosis of chronic compartment syndrome or with Ms. Miller's conclusions.

For the reasons discussed in connection with plaintiff's first assignment of error, the ALJ did not err by deciding to accord "little weight" to Ms. Miller's opinions. Because Ms. Miller is not an "acceptable medical source" as defined in the Social Security regulations, it was within the ALJ's discretion to determine what weight to accord her opinions based on all the evidence in the record. *Walters*, 127 F.3d at 530. The ALJ reasonably discounted her opinions for the reasons stated. The record shows that Ms. Miller saw plaintiff only once prior to issuing the RFC assessment, and Ms. Miller gave no indication that she had reviewed plaintiff's records before preparing the assessment. *See Yamin v. Commissioner of Social Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) (doctor who examined claimant on only two occasions did not have a long term overview of claimant's condition). Plaintiff's third assignment of error should be overruled.

## 4. The ALJ did not err by improperly assessing plaintiff's credibility.

Plaintiff alleges as her fourth assignment of error that the ALJ erred in assessing her credibility. Plaintiff asserts that: (1) the ALJ erroneously found that she had been working for four months as of May 5, 2008, at Kilbourne Medical Lab (Doc. 10 at 20, citing Tr. 15); (2) the ALJ inaccurately characterized plaintiff's mental impairments as being "stable on medication" and stated that multiple treatment notes described her mood as "euthymic," which was either incorrect or misleading (Doc. 10 at 21-22, Doc. 12 at 6); (3) the ALJ improperly discounted plaintiff's credibility based on her failure to pursue health care treatment for a 15-month period between February 2007 and May 2008 when she had no health insurance; and (4) the ALJ erroneously discounted plaintiff's credibility based on her marijuana use when the record shows that her testimony about her drug use was consistent with the record, and plaintiff should not be penalized for an incorrect statement plaintiff's counsel made in a prehearing brief that plaintiff's marijuana use ended in 2006.

The Commissioner argues that plaintiff's indirect challenge to the ALJ's mental RFC finding has no bearing on the credibility determination because the ALJ's interpretation of the mental health treatment records is reasonable; the ALJ reasonably relied on inconsistent statements about plaintiff's drug use contained in the record and made by plaintiff's counsel on behalf of plaintiff; and the ALJ relied on additional evidence that plaintiff does not address in finding plaintiff was not wholly credible.

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly.

*Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.,* 667 F.2d 524, 538

(6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, [she] must clearly state

[her] reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for

crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for

meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing

*Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p, 1996 WL 374186, at *2 (July 2, 1996), describes the

requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the
> individual's allegations have been considered' or that 'the allegations are (or are
> not) credible.' It is also not enough for the adjudicator simply to recite the factors
> that are described in the regulations for evaluating symptoms. The determination
> or decision must contain *specific reasons* for the finding on credibility, supported
> by the evidence in the case record, and must be sufficiently specific to make clear
> to the individual and to any subsequent reviewers the weight the adjudicator gave
> to the individual's statements and the reasons for that weight.

(emphasis added).

Here, plaintiff has failed to show that the ALJ's credibility finding should be disturbed.

First, plaintiff has not established that the credibility finding must be overturned because the ALJ

erroneously relied on the Diagnostic Assessment Form dated May 5, 2008 (Tr. 474-482) to find

plaintiff apparently had been working at Kilbourne Medical Lab for four months as of that date.

(Tr. 15). Plaintiff alleges that the form was actually first completed in September 2006 and

simply updated on May 5, 2008, and therefore shows that plaintiff had been working for four

months as of September 2006. (Tr. 474, 478, 480-82). However, the only date listed on the form

is May 5, 2008. (Tr. 474). No earlier date is provided, so it is not clear when the information

about plaintiff's employment at Kilbourne Medical Lab was actually provided. Nonetheless,

even if the employment date gleaned from the form by the ALJ is incorrect, the ALJ cited a number of other valid reasons for discounting plaintiff's credibility, and those reasons provide substantial support for the ALJ's credibility finding.

In addition, plaintiff has failed to show that the ALJ improperly discounted her credibility based on an inaccurate assessment of the mental health treatment records. Plaintiff cites no evidence in support of her contention that the ALJ improperly interpreted the medical records as showing she had made progress with mental health treatment and her mental condition had improved. (Doc. 10 at 22). Moreover, the record shows that the ALJ was correct in noting that several treatment notes described plaintiff's mood as "euthymic." (Tr. 15, citing Tr. 447, 448, 466, 556, 558, 562, 564).

Furthermore, the ALJ was entitled to discount plaintiff's credibility about the severity of her mental health impairments based on plaintiff's failure to seek therapy between January or February 2007 and May 5, 2008. Plaintiff alleges in her Statement of Errors that the ALJ erred in this regard because she did not have health insurance during this 15-month time period, she did not have access to a mental health specialist, she was overwhelmed by the treatment for her compartment syndrome, and she sought treatment from her primary care physician. (Doc. 10 at 22-23). However, the ALJ did not rely on plaintiff's failure to seek treatment when she lacked insurance in discounting her credibility. Instead, the ALJ relied on plaintiff's failure to seek therapy when she had insurance, noting that plaintiff stated to treating providers that after her insurance was changed and she once again had insurance that she "just did not think about seeing another therapist." (*See* Tr. 474) (Tr. 15). The ALJ reasonably discounted plaintiff's testimony

concerning the severity of her mental impairments based on her failure to seek therapy for a period of time without justification.

Finally, plaintiff alleges that the ALJ should not have relied on contradictory information in the pre-hearing draft counsel submitted on plaintiff's behalf, plaintiff's testimony at the hearing, and plaintiff's statements to her medical providers concerning when plaintiff last smoked marijuana. Plaintiff alleges that her credibility should not be diminished by her counsel's "minor error or 'typo.'" (Doc. 12 at 7). However, plaintiff has not shown that the ALJ was aware that the conflicting information she noted was the result of a typographical error by counsel. The ALJ was entitled to rely on contradictory representations regarding plaintiff's alleged substance abuse made by plaintiff and by counsel for plaintiff on her behalf in discounting plaintiff's credibility.

In addition to discounting plaintiff's credibility on the above grounds, the ALJ determined that plaintiff's allegations of disabling impairments were inconsistent with her activities of daily living, her ability to care for herself, and her interactions with others. These were valid considerations for the ALJ to take into account in assessing plaintiff's credibility. The ALJ's credibility determination is supported by substantial evidence, and the Court has no basis for disturbing the credibility finding. Plaintiff's fourth assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: _9/5/2012_                  Karen L. Litkovitz
                                  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHERYL RHOTEN,                                 Case No. 1:11-cv-571
      Plaintiff                                 Spiegel, J.
                                              Litkovitz, M.J.

      vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).